Sarah ILLIG and Gale Illig, for themselves, and as representatives of a class of similarly represented persons, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 98–934L.

United States Court of Federal Claims.

Dec. 3, 2003.

---

lated to liability and joint proposal regarding future proceedings. In accordance with that stipulation, we granted plaintiffs' March 2, 2001 motion for partial summary judgment as to liability with respect to the named plaintiffs Sarah and Gale Illig.[1] What remains is to determine the amount of just compensation. That question turns on the scope of the easement taken by the government.

The parties' cross-motions for summary judgment address three issues preliminary to the calculation of damages: (1) the width of the easement taken by the government; (2) what right of use, if any, plaintiffs have as underlying fee owners in the land burdened by the easement; and (3) whether compensation should take account of the utility licenses which currently burden plaintiffs' property. Resolution of these issues is complicated, though not made impossible on summary judgment, by gaps in the land records.

Mark F. Hearne, II and Amy Marchant, St. Louis, Missouri, for the plaintiffs.

Kristine S. Tardiff and Joy Ryan, Environment and Natural Resources Division, United States Department of Justice, for defendant. With them on the briefs were Thomas L. Sansonetti, Assistant Attorney General, Evelyn Kitay, Office of General Counsel, Surface Transportation Board, of counsel.

## OPINION

BRUGGINK, Judge.

This is a class action brought by landowners pursuant to the Takings Clause of the Fifth Amendment. Plaintiffs claim that the National Trails System Act, as amended, 16 U.S.C. § 1241 (Supp. II 1996) ("Trails Act"), lead to an uncompensated taking of an easement over their lands. On October 22, 2001, we adopted the parties' joint stipulations re-

## BACKGROUND

The land at issue consists of 6.2 miles underlying the former Carondelet Branch of the Missouri Pacific Railroad Company ("MoPac"),[2] constructed in 1872. This portion of the Carondelet Branch is now known as "Grant's Trail." MoPac received the easement over the land for the Carondelet Branch through several avenues, including voluntary grants and condemnation. Some portion of the land through which the Carondelet Branch runs was originally part of a larger parcel owned by President Ulysses S. Grant. In a letter dated April 6, 1872, Grant authorized his agent to deed MoPac a right-of-way:

I am in receipt of your letter in which you say that Dr. Steinhaur demands large damages from the railroad for running through his place. I am sorry to hear this for I know no land that will be benefitted more by the road than his.... For my

---

1. Liability as to other class members was reserved pending final determination of class membership. On January 31, 2002, we adopted the parties' joint status report filed January 4, 2002, and ordered the class closed. Pursuant to the parties' joint stipulation adopted by this court on October 22, 2001, we granted summary judg-

ment to all class members on the question of liability.

2. "MoPac" is used hereinafter to refer to the Missouri–Pacific–Railroad Company and its predecessors-in-interest, which includes Pacific Railroad.

own part I proposed, as soon as the road was spoken of, to give the right of way wherever my land was touched, both on the farm and near Carondelet, and to give five acres off the farm for a depot. Since that [sic], at the suggestion of Mr. Hays, I agreed to make the depot grounds twenty acres, but to be sold in lots one half the proceeds to come to me, the other to go to the road. You are at liberty to state this to Mr. Pierce.

No deed granting an easement has been located which actually consummates these instructions.[3] However, the parties agree that under Missouri law, by President Grant's letter and the railroad's subsequent use of the property, Pacific obtained an easement by estoppel for railroad purposes over at least a portion of the 6.2 miles at issue here. *See Grantwood Village v. Missouri Pac. R.R.*, No. 94–302 (E.D.Mo. Sept. 13, 1995), *aff'd*, 95 F.3d 654 (8th Cir.1996). The fee interest in President Grant's property was subsequently subdivided, and through *mesne* conveyances, is now held by multiple successors in title to President Grant.

In addition to obtaining railroad easements by voluntary grant or estoppel, MoPac also obtained an easement over at least a portion of the balance of the Carondelet Branch by condemnation. On April 27, 1872, Pacific filed a condemnation petition in Circuit Court for the County of St. Louis, Missouri. The petition covered a twelve mile stretch of land which would become part of the Carondelet Branch and included a portion of the 6.2 mile stretch at issue here. The decree described the right-of-way for several parcels as follows: "thence ... in southeast direction fifty (50) feet to its intersection with said centre line of the Carondelet Branch: thence in the same direction with said boundary line fifty (50) feet more ...."[4] The commissioners appointed by the court filed their report on September 23, 1872. Each parcel was specifically described. The metes and bounds of the railroad right-of-way were then outlined for each parcel.[5] The condemnation petition gave notice to those persons having or claiming an interest, all of whom had previously refused to grant MoPac an easement.

The parties agree that the width of the easement running through those parcels subject to the 1872 Condemnation Decree is 100 feet. The parties disagree, however, as to the width of the easement by estoppel which arose by operation of the Grant letter as well as the width of the easement on parcels for which there is no record of any conveyance to the railroad. Defendant argues for a 100 foot wide easement; plaintiffs argue for a much narrower width.

Facts surrounding the implementation of the Trails Act are also relevant in this regard and with respect to whether the Trails Act caused the loss of license fees. On January 27, 1992 and February 12, 1992, Gateway Trailnet ("Trailnet") petitioned the ICC for permission to use the Carondelet Branch railbank for interim trail use. On February 7, 1992, MoPac filed a Notice of Exemption with the ICC seeking to abandon railroad service over the Carondelet Branch. The Notice of Exemption was required by the Trails Act in order for MoPac to abandon or discontinue its railroad service on the Caron-

---

3. Plaintiffs provided the court with an affidavit from a Pat Kiely, Vice President of Commonwealth Title, to the effect that he could find no recorded instrument or condemnation proceeding by which Pacific, or any predecessor, acquired an interest in any property formerly owned by President Grant.

4. Defendant points out that some of the condemnation awards describe a width of 116 feet "thence .. in a southern direction fifty-eight and 1/24 (58' 0'/2") feet to its intersection with the said centre line of the Carondelet Branch; then in the same direction with said boundary line fifty eight and 1/24 (58' 0'/2") feet more ...." Plaintiffs argue that the property which is subject to this larger width of 116 feet is not subject to

this action, but along a separate section of the trail. The parties nevertheless stipulate that the easement resulting from the condemnation proceeding was 100 feet in width.

5. The parties dispute whether a portion of the land condemned in this action was owned by President Grant. If it was, it would then have been subject both to his transfer and the condemnation proceeding. Plaintiffs argue that the condemnation decree and awards do not affect the property then owned by President Grant, which is subject only to an easement limited to the width of the railroad's use. Because we determine that this portion of the easement is a uniform 100 feet in width, the dispute is immaterial.

delet Branch. *See Glosemeyer v. United States,* 45 Fed.Cl. 771, 774 (2000) (outlining the process for railroad right-of-way abandonment under the Trails Act.); 49 C.F.R. §§ 1152.20, 1152.22. On March 25, 1992, the ICC issued a "Notice of Interim Trail Use or Abandonment" ("NITU") allowing MoPac to remove its track, and cease operation of the railroad. The NITU made interim trail use contingent upon the negotiation of a trail use agreement.

MoPac and Trailnet entered into a Donation, Purchase and Sale Agreement ("Trail Use Agreement") on December 30, 1992, pursuant to Section 8(d) of the Trails Act. The Trail Use Agreement and subsequent Quitclaim Deed between MoPac and Trailnet conveyed "All rights, title and interest in and to the right of way and appurtenances of the Carondelet Branch of the Missouri Pacific Railroad between mile Post 15.8 and Mile Post 22.0 in St. Louis County, Missouri."

During its operation of the railroad over the Carondelet Branch, MoPac granted licenses to various entities, allowing them to use a portion of the right-of-way.[6] For example, it granted Union Electrical Company ("UE") a license for a wire crossing across the Carondelet Branch as early as November 25, 1925.[7] The Metropolitan St. Louis Sewer District received a license to lay a sewer line within MoPac's right of way in 1962. LacledeGas Company gained a license to locate a gas line within the right-of-way in 1965. These utilities compensated MoPac for the use of the right-of-way.

The most significant of the licenses conveyed by MoPac to Trailnet, plaintiffs argue, are likely the longitudinal licenses with UE. UE's licenses, while not the only licenses at issue here, are representative of the operation of the licenses at issue. Prior to its abandonment of the railroad right-of-way in 1992, MoPac executed a number of "Wire Line License" agreements with UE, under which UE asserted permission to install, maintain, and use power lines on the railroad easement over plaintiffs' property. On the

basis of these Wire Line Licenses UE entered upon the railroad easement and installed electric transmission poles, lines, and appurtenances. Based on the records obtained by the parties it appears that various other utility companies were able to reach similar agreements with MoPac regarding use of the subject right-of-way. Some of the agreements are in the form of licenses, and others are easements. Most of these agreements were entered into between 1906 and 1937, but some wire line licenses date from 1971 and 1972. There is nothing in the record suggesting landowners objected to these licenses or "sub-easements."

Once the NITU was issued, MoPac had 180 days to negotiate an agreement on interim trail use with Trailnet. Anticipated payments stemming from utility licenses were an integral part of negotiations between Trailnet and MoPac. A draft contract required Trailnet to make a $40,000.00 down payment and execute a promissory note for the remaining purchase price of $410,000.00. Later, in a letter dated November 24, 1992, Trailnet informed MoPac that its Board of Directors authorized a maximum payment of $150,000.00 over a two-year period for the right-of-way. The letter further explained that this maximum payment was contingent upon Trailnet reaching a separate licensing agreement with UE for continuation of the utility license. On December 7, 1992, Richard Gilpin, attorney for Trailnet, sent a letter to Ms. Christine Smith, attorney for MoPac. Attached was a first draft of an agreement between the parties, which provided for MoPac and Trailnet to divide equally the proceeds of any sale of a license granted to UE.

The final Trail Use Agreement stated that the purchase price of the trail easement was $450,000.00, $40,000.00 of which was a down payment, while the remaining $410,000.00 was secured by a Promissory Note and Deed of Trust. The Trail Use Agreement made some of the payment conditional upon success in maintaining the licensing fees:

---

**6.** These licenses could be terminated by either the utility or MoPac 30 days after a written notice of intent to end the term of the license.

**7.** Attached to that license is a letter outlining all agreements between MoPac and UE, dating back as early as March 19, 1906.

(i) Three Hundred Thousand Dollars ($300,000.00) of the balance of the Purchase Price covered by the Note as provided in (b) above shall be forgiven and be deemed satisfied and discharged if, as of December 31, 1997, [Trailnet] or its successor in title has not, for valuable consideration transferred to ... [UE] longitudinal easement(s) or similar grant(s) or right(s) (the "UE Easement Transfer") for maintenance, operation and use of the facilities of [UE] located as of the date of the closing on the Property. [Trailnet] agrees to use its best efforts to negotiate and consummate the UE Easement Transfer on or before December 31, 1997, and to achieve the maximum consideration from [UE] therefor.

(ii) If the UE Easement Transfer is consummated on or before December 31, 1997, then (A) an amount equal to one half [up to a maximum of Three Hundred Thousand Dollars ($300,000)] of the amount of the consideration paid by [UE] to [Trailnet] for the UE Easement Transfer, shall be immediately due and payable by [Trailnet] to [Mo-Pac] and (B) if such one-half of the consideration for the UE Easement Transfer is less than Three Hundred Thousand Dollars ($300,000.00), then the amount of such difference between $300,000.00 and one-half of such consideration shall be deemed satisfied and discharged.

The agreement specifically provided that the property conveyed was subject to leases and licenses, which would be assumed by Trailnet:

The Property is subject to the leases and licenses ("Leases and Licenses") listed on Exhibit D attached hereto and hereby made a part hereof. At closing, the Leases and Licenses, to the extent the Property is covered thereby, shall be assigned to and assumed by [Trailnet] by Assignment and Assumption of Leases and License .... Rentals under the Leases and Licens-

es shall be pro-rated as of the date of closing, and [MoPac] shall retain all rights to all rental due for the period prior to closing, including, without limitation, the right to collect such rental directly from the tenant or licensee and to receive from [Trailnet] any such past-due rentals paid to [Trailnet].

MoPac, on December 30, 1992, executed a quitclaim deed conveying all of its interests to Trailnet. On the same day MoPac and Trailnet entered into a blanket assignment of various agreements previously entered into between MoPac and licensees, including UE.

Subsequently, on January 27, 1994, MoPac and Trailnet entered into a Partial Assignment Rider Agreement, under which MoPac assigned a Wire Line Crossing Agreement with UE to Trailnet. The Agreement provided that it "shall be considered as taking effect as of the 30th day of December, 1992."[8] In letters to UE dated February 24, 1994, March 7, 1994, and April 27, 1994, Trailnet sought payment by UE for licenses assigned by MoPac to Trailnet in the Trail Use Agreement. In a December 2, 1994 letter to St. Louis County, Trailnet stated that it owed $300,000.00 to MoPac by the end of 1997, "[t]o be funded by transaction with [UE]: we are to sell UE an easement for existing utility licenses on the corridor." Letter from Curtis to Westfall Dec. 2, 1994.

## DISCUSSION

 A landowner who is able to show a physical, partial taking of property is entitled to the difference in value before and after the taking. *See Moore v. United States*, 54 Fed. Cl. 747, 749 (2002). The "before and after" calculation requires "a determination of the fair market value of the entire affected parcel as if the easement did not exist and then another determination in light of the taking." *Id.* The "affected parcel" may include land not directly the subject of the easement, but which is impacted by severance damages.

---

**8.** Investigation by plaintiffs' counsel revealed no record of any agreement or transfer of interest in the Carondelet Branch right-of-way to UE by either plaintiffs or their predecessors in interest.

No evidence has been found to indicate that UE exercised condemnation authority in connection with its use of the Carondelet Branch right-of-way.

Here, to measure the interest in the plaintiffs' property that the government has taken, we begin by determining the interest that the plaintiffs would have enjoyed, after abandonment, in the absence of the Trails Act. *See Preseault v. ICC,* 494 U.S. 1, 20, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990) (O'Connor, J., concurring). That determination not only includes the physical width of the easement taken, but also the legal scope of the interest taken under Missouri law, including its exclusivity. In order to determine the government's liability we therefore must resolve the three issues presented here: (1) the width of the easement taken by the government; (2) the right of use, if any, plaintiffs retain in the land burdened by the easement; and (3) whether the government must compensate plaintiffs for the utility licenses which currently burden plaintiffs' property.

### I. Width of the Easement

■ Under Missouri law, an easement may arise through condemnation, through an express or implied grant, through prescriptive use, or through estoppel. *Allee v. Kirk,* 602 S.W.2d 922, 924 (Mo.App.Ct.1980). To the extent the easements here arose through condemnation, the width of the easement is no mystery. The condemnation decree exists and reflects a specific width—100 feet.[9] To the extent the parties have been able to locate written express grants which indicate width, those also have shown easements at least 100 feet wide and hence are not in dispute. Two scenarios thus remain in dispute: easements by estoppel, and two circumstances involving grants, those in which no evidence of the grant can be located, and

those as to which there is secondary evidence of a grant.[10]

■ Easements by estoppel, at least insofar as relevant under the current circumstances, arise where an easement is established solely through extrinsic evidence—*i.e.,* where there is secondary evidence of a promise and reliance, but no proper conveyance was ever recorded. *Allee,* 602 S.W.2d at 924. That method of proof is made applicable in the present circumstances only with respect to easements existing on the former Grant property. The evidence supports the finding that President Grant authorized execution of an easement, although no other documentary evidence of a deed exists. As to those parcels once part of the original Grant property, although the parties agree that an easement by estoppel was created, they disagree as to the means of proving width. Defendant contends that the contemporary and subsequent extrinsic evidence is sufficient and exclusive to demonstrate a 100 foot width. Plaintiffs contend that such proof is trumped by proof of actual use, which in this case is disputed, and which could vary depending upon the profile of the rail bed or other evidence of use, such as improvements, landscaping, or maintenance.[11] Because the promise relied upon by the party asserting estoppel is the basis of such an easement, we believe written parol evidence is necessary and sufficient to determine the extent of the grant originally made.[12]

As to easements allegedly created by grant in which the deed of conveyance is missing, defendant argues that the same type of extrinsic evidence offered to determine the width of the easement by estoppel across the

---

9. The decree, issued on June 8, 1872, outlined the plat and profile of the railroad's planned construction of the Carondelet Branch. The parties agree that by its express terms, the railroad acquired a 100 foot wide easement.

10. Through stipulations of fact and the characterization of those facts presented in their cross-motions, the parties have presented us with unspecified classes of properties. Our opinion, therefore, is applicable to broad categories of properties. It will be left to the parties to sort out its applicability to specific claims.

11. Plaintiffs recognize that, if this is the law, the evidence now before the court on summary judgment would not permit a conclusive finding.

Moreover, because of the expense involved in gathering evidence of use, plaintiffs propose that the parties stipulate to a thirty foot wide easement.

12. *See Sanford v. Kern,* 223 Mo. 616, 122 S.W. 1051, 1056 (1909) ("[A] license to use a way or an easement, though without consideration at its inception, may not be revoked at will where, from the very nature of the license, the licensee was expected to go to great expense in order to enjoy it and where that expense has been incurred.").

former Grant property establishes a uniform 100 foot wide easement across those properties as well. Where there is some secondary evidence that such a grant actually did exist, we believe Missouri law allows us to look at such extrinsic evidence to elucidate the contents of the now missing grant. However, where there is no evidence offered that any such grant, in fact, existed, we believe it would be inappropriate to consider such evidence. Such easements may only be considered prescriptive easements, whose widths must be established through proof of use.

### A. Actual Agreement/Understanding

■ When the terms of description contained in an express grant are ambiguous or nonexistent, the general rule is that extrinsic evidence may be used to ascertain the intent of the parties. JON W. BRUCE & JAMES W. ELY, JR., THE LAW OF EASEMENTS & LICENSES IN LAND, at § 7:6 (2001).[13] While Missouri currently has "a rather complete statutory system for recording instruments affecting title to real estate," *Woodbury v. Conn. Mut. Life Ins. Co.*, 350 Mo. 527, 166 S.W.2d 552, 552 (1942), old written conveyances, like some of those at issue here, often are not found in the record of title. Such deeds are not void automatically, but are still binding between the original parties and all who take title subsequent to the unrecorded conveyance having actual notice of the encumbrance. *See id.* Because we believe no one could possibly take title to land encumbered by a railroad's right-of-way without notice of it, any deed originally conveying such an interest to the Railroad is good against any current landowner even though the actual deed cannot be found.

We also believe it is appropriate, following the general rule allowing admission of extrinsic evidence to elucidate ambiguous or missing terms of a conveyance, to look to such evidence to determine the contents of those original conveyances which now cannot be found, as long as there is evidence that such a conveyance indeed did exist at one time. A missing deed will only fail if "after resorting to oral proof or after relying upon other extrinsic or external proof or evidence, that which was intended by the instrument remains mere matter of conjecture." *Hoelscher v. Simmerock*, 921 S.W.2d 676, 679 (Mo.Ct.App.1996) (providing guidance on the interpretation of ambiguous deeds). As stated above, we also believe it is appropriate to examine extrinsic evidence to determine the scope of the promise made to MoPac forming the basis of the easement by estoppel across the former Grant property.

#### 1. Contemporaneous extrinsic evidence

Defendant argues that all available evidence contemporaneous with MoPac's original acquisition of the subject right-of-way indicates that the intent was to grant a right-of-way 100 feet in width. This evidence includes (1) Missouri law in effect at the time the Carondelet Branch was constructed, (2) the condemnation awards for the Carondelet Branch, and (3) a description of the easement in a contemporaneous deed between one of Grant's lessees and the railroad company.

The Carondelet Branch was constructed in 1872. At that time Missouri law granted railroad corporations certain powers and privileges, including the right:

13. *Geismann v. Trish*, 163 Mo.App. 308, 143 S.W. 876, 877 (1912) ("It is true that the location of the way could not be determined from a mere reading of the deed. The language used leaves us in doubt as to the real intention of the parties in that respect. But in such circumstances the trial court was at liberty to receive parol evidence showing the situation and conduct of the parties and the state and condition of the premises, with a view to ascertaining the intention of the parties in using the language to be construed."); *see also Bernero v. McFarland Real Estate Co.*, 134 Mo.App. 290, 114 S.W. 531, 535 (1908) ("[T]he principle obtains alike to ambiguity in deeds creating an easement. In order to elucidate the matter of intention in such cases, resort may be had to parol testimony, to the end that the court may be indued with the knowledge the parties had of the situation and thus directed to the obvious purpose of the grant; in this case, the use of the subject-matter granted. And so too, parol evidence may be given to show the conduct of the parties with respect to the subject-matter of the grant, contemporaneous with and recently after its execution. Such contemporaneous exposition by the conduct of the parties tends, with great force, to elucidate the intention concealed in ambiguous words." (Citation omitted)).

[t]o lay out its road, not exceeding one hundred feet in width, and to construct the same; and for the purpose of cutting and embankments, to take as much more land as may be necessary for the proper construction and security of the road, and to cut down any standing trees that may be in danger of falling on the road, making compensation therefore, as provided in this act, for lands taken for the use of the company.

Mo. Laws 23rd Sess. 1866, p. 27 § 2. Defendant contends that this statutory provision represents a legislative determination that 100 feet is the presumptive standard for railroad rights-of-way within the state, and, in the absence of evidence to the contrary, it is appropriate to presume that MoPac was granted the full width allowed by the statute.

Defendant also points out that MoPac acquired a large portion of the Carondelet Branch by condemnation proceedings commenced in 1872. When the Circuit Court of St. Louis County issued the condemnation decree, the court stated that MoPac had filed its "plat and profile" for its road and that "the road bed of such branch road is one hundred feet in width" and extends for approximately twelve miles. This reference included the 6.2 mile segment at issue here. The condemnation awards, contained in the Commissioner's Report filed with the court, confirm that the right-of-way corridor acquired by MoPac was at least 100 feet in width. Defendant argues that this strongly suggests that the railroad would also have acquired other parcels of similar width.

Additionally, an ICC Schedule of Lands, dated February 1920, reveals that those portions of the Carondelet Branch that were not acquired by direct condemnation were acquired by MoPac primarily through warranty deeds and quitclaim deeds, although the parties have been able to recover only one quitclaim deed identified on the ICC schedule. In that deed, dated September 25, 1872, John Mathews, who leased land from President Grant, quitclaimed to Pacific Railroad a strip of land described as "one hundred feet in width, being fifty-feet on each side of the center line of the main track of the Carondelet Branch."

### 2. Extrinsic Evidence Post–Dating Mo-Pac's Acquisition

Defendant also cites extrinsic evidence post-dating the original acquisition as further support for the conclusion that MoPac acquired a 100 foot wide uniform corridor across the properties. Defendant first points to the ICC schedule, discussed above, which was originally compiled in 1920, and the right-of-way maps ("Val Maps") dated from June 30, 1918. Although the ICC schedule identifies each parcel acquired by MoPac for the Carondelet Branch by, *inter alia*, a parcel number, method of acquisition, grantor, the acres or square feet of the land, and the price paid, the schedule itself does not list the width of the right-of-way corridor. The Val Maps, however, which cross-reference the parcels identified on the schedule, show the location of the Carondelet Branch and indicate that the right-of-way is a uniform 100 feet in width.

Defendant also points to more recent evidence which it believes proves that the original understanding of the parties was that the Carondelet Branch would be a uniform 100 feet in width. On January 21, 1992, MoPac submitted a "Historic Report" on the Carondelet Branch to the ICC in connection with its application for authorization to abandon its line. MoPac was required to include in the report a "written description of the right-of-way (including approximate widths, the extent known), and the topography and urban and/or rural characteristics of the surrounding area ...." 49 C.F.R. § 1105.8. The written description provided by MoPac stated:

> The abandonment begins at milepost 15.8 and meanders in a generally easterly direction through a variety of land uses which include residential, industrial, commercial and recreational to the end point of the abandonment at milepost 22.0. The right-of-way between these points is 100 feet wide and is described as being mostly level with surrounding properties.

Def. Ex. 9 at 37.

Additionally, defendant points out that none of the deeds accompanying the entries of appearance for the plaintiffs detail the presence of a right-of-way of less than 100

feet, although there are many deeds and instruments supplied by the class member plaintiffs which contain no width description. For example, class member D.E.M. Truck Service, Inc. accompanied its entry of appearance with a 1900 warranty deed, by which it acquired its property. This deed describes the parcel acquired as extending "to an iron pipe in the North line of the Right of Way of the Carondelet Branch of the Missouri Pacific Railroad, 100 feet wide . . . ." Another class member, Affton Athletic Association, acquired its property pursuant to a 1971 deed which includes a description of the parcel as "[a] tract of ground located in Lakeshire of the West line of New Tesson Ferry Road 60 feet wide and the North line of the Missouri Pacific Railroad right-of-way 100 feet wide."

Class member Metropolitan St. Louis Sewer District accompanied its entry of appearance with two general warranty deeds, dated January 24, 1975 and June 23, 1981, respectively, which both reference MoPac's existing right-of-way as "the right-of-way of the Missouri Pacific Railroad 100 feet wide." Similarly, Robert J. and Marcia K. Chilson accompanied their entry of appearance with a 1992 deed of trust that includes a legal description of two parcels, both of which refer to "the Southeastern line of the Right of Way, 100 feet wide, of the Carondelet Branch of Missouri Pacific Railroad." Other deeds do not expressly identify the width of the right-of-way, but of all the deeds that actually contain a description of the width of Mo-Pac's easement, not one describes the easement as being less than 100 feet wide.

In addition, many of the utility licenses related to the subject right-of-way corridor have attached maps showing the specific location of the utilities. These maps consistently depict MoPac's right-of-way corridor as 100 feet in width. Additionally, on December 30, 1992, MoPac quitclaimed the subject right-of-way to Trailnet pursuant to the Trails Act and the NITU issued by the ICC. The legal description of the property conveyed, contained in Exhibit A to the deed, does not provide any specific metes and bounds description of the property conveyed, but it does incorporate by reference a number of surveys and subdivision plats that depict segments of the subject right-of-way. These surveys and subdivision plats were used to create many of the maps attached to the utility licenses referenced by defendant, and in each case MoPac's right-of-way is described as 100 feet in width. Finally, a 1993 survey of the area where the Illig's property is located, conducted in connection with a road dedication, depicts MoPac's right-of-way on the Illig's property, as well as on the property of other class members, as 100 feet in width.

## B. Proof of Use

Plaintiffs believe it is inappropriate to consider extrinsic evidence to determine the parties' original intent as to the width of the corridor right-of-way across any of the parcels, and that the width of the corridor for such parcels should be determined by actual use. Such a determination, argue plaintiffs, should be based on the width of the track, the roadbed, all improvements, and any utility features erected thereon pursuant to licenses granted by the railroad to utility entities.

Plaintiffs point to *Boyce v. Missouri Pacific Railroad Co.*, 168 Mo. 583, 68 S.W. 920 (1902), as instructive. That case involved the acquisition of an easement by prescription by the defendant railroad company over Boyce's property. The court found that the scope of the railroad's interest was limited to a fifteen foot strip upon which the tracks were located. Plaintiffs urge that we take a similarly narrow approach to the railroad corridor at issue here. Plaintiffs believe that the width of the property occupied and used by the railroad in this manner is approximately 30 feet.

Defendant argues that plaintiffs' approach to "actual use" is too narrow; that the actual width of a right-of-way used by a railroad is not limited to the track area or road bed. Defendant points to *Williams Pipeline Co. v. Allison & Alexander, Inc.*, 80 S.W.3d 829 (Mo.Ct.App.2002), in which the court was required to determine the width of a pipeline easement. Although the pipelines only occupied an area 30 feet in width, the court agreed with the trial court that the total

width of the easement was 100 feet because "substantial factual evidence" existed that "repairmen would require an area at least 100–feet wide to reasonably and safely access the pipelines." *Id.* at 836.

Defendant contends that *Williams* is directly on point and that we should follow a similar approach here. The *Williams* case, it is argued, is consistent with the general principle that a railroad right-of-way, like a highway easement, must necessarily encompass sufficient width for the road or tracks themselves, the road bed, shoulders, and the area needed for cuts and fills to deal with slopes and to ensure proper drainage. Proper construction and maintenance also requires sufficient width to control vegetation. Missouri's condemnation statute, Mo. Laws 23rd Sess. 1866, p. 27 § 2, discussed above, specifically contemplates the need of a railroad company "to cut down any standing trees that may be in danger of falling on the road."

### C. Conclusion

 With respect to the Grant property, we agree with the District Court in *Grantwood Village v. Missouri Pacific Railroad,* slip op. (E.D.Mo. Sept. 13, 1995), that the easement was one by estoppel. Under Missouri law, an easement for which no proper conveyance ever existed may only arise through estoppel or prescription. *Allee,* 602 S.W.2d at 922. The party asserting estoppel must show meaningful reliance on a promise to provide an easement. *Id.* (quoting *Sanford,* 122 S.W. at 1056). Here, promise and reliance are not contested. The only issue, therefore, is the scope of the promise originally made by Grant. We believe that under the reasoning announced in *Allee,* it is appropriate to look at all the extrinsic evidence offered to determine the width of the easement by estoppel which existed over the Grant property. *See id.* at 925–26.

In light of such evidence, we believe that defendant has the better argument. For those parcels of land that were originally part of the parcel held by President Grant, and which are now subject to an easement by

estoppel, the evidence supports a conclusion that the original promise made to MoPac was for a 100 foot wide easement, and that the railroad relied on that belief. For the same reason, we also believe that for those parcels not subject to the condemnation decree, nor part of the original Grant property, but for which adequate evidence exists that a written conveyance at one time, in fact, existed, it is appropriate to look at the same extrinsic evidence to determine the content of the original deed.[14]

In the same year as Grant's authorization letter, MoPac commenced condemnation proceedings in the Circuit Court of St. Louis County for a section of land that would become part of the Carondelet Branch. That year, MoPac also obtained a quitclaim deed from John Mathews, a tenant of President Grant, relinquishing any claim Mathews had in the corridor easement which would become part of the Carondelet Branch. Both the relevant condemnation documents and the Mathews deed acknowledge that the width of the easement was understood to be 100 feet. While we do not believe that Missouri's condemnation statute, Mo. Laws 23rd Sess. 1866, p. 27 § 2, viewed in isolation, would provide us with a sound basis for finding that all parties involved assumed the easement to be 100 feet wide, it adds to the aggregate data presented here in favor of us finding a 100 foot wide right-of-way.

The extrinsic evidence post-dating MoPac's other 1872 acquisitions also supports finding an easement 100 feet wide. The documentation uniformly shows that all parties involved consistently believed the width of the easement to be not less than 100 feet wide. The ICC Schedule and the corresponding Val Maps, the Historic Report, the deeds accompanying the entry of appearances, and the licenses agreements all describe MoPac's right-of-way as at least 100 feet wide.

Finally, we note that Missouri law appears to disfavor bottlenecking. Plaintiffs essentially urge us to find that MoPac's corridor runs at an even 100 feet in width for most of the length of the Carondelet Branch but then

---

14. We do not decide here what evidence necessarily qualifies as "adequate" proof that a written conveyance once existed. That issue was not

*specifically briefed, and we leave it to the parties to address this issue in a claim-by-claim fashion at a later stage of the proceeding.*

abruptly narrows to thirty feet for the length of certain parcels for which no specific deed can be found. In *O'Brien v. Richter*, 455 S.W.2d 473 (Mo.1970), the Missouri Supreme Court confronted a similar argument with regard to a roadway and rejected it partially because of the unreasonableness of the result. "It is unreasonable, illogical, and of little value to allow roadways joining one property to another to take the form of an hourglass and force traffic to flow through the three-foot length, when proper, reasonable development and roadway usage would require it to be a uniform width throughout." *Id.* at 476–77; *see also* Mo. LAWS 23rd Sess. 1866, p. 27 § 2 (granting railroad corporations the right to condemn a strip of land for use as a right-of-way easement up to 100 feet in width as well as any additional land needed "for the proper construction and security of the road").

What we have said disposes of those properties subject to the condemnation decree, those which were originally part of the Grant property, and those for which a written conveyance once existed but can no longer be located. As to those properties we believe proof of a narrower use does not trump the extrinsic evidence of a 100 foot wide easement.

■ On the other hand, for any properties not subject to the condemnation decree, which were not part of the original Grant property, and for which no evidence for any deed can be found, we believe it is inappropriate to look to extrinsic evidence to determine the original agreement of the parties when no proof that any agreement ever existed has been offered.[15] Under Missouri law, we believe it would be incorrect to use such extrinsic evidence to elucidate an agreement that we have no reason to believe ever existed. Under the circumstances, these appear to be easements by prescription. The

width of such an easement can only be established by proof of use. The proof offered as to use here is disputed and summary judgment as to the width of the easement across such parcels is thus inappropriate.[16]

## II. Exclusivity of the Right-of-Way

■ The parties do not dispute that, under Missouri law, an easement for railroad use is exclusive. *See Boyce*, 68 S.W. at 921–22 (stating that a railroad is entitled to exclusive use of an easement for railroad purposes); *Chicago, S.F. & C. Ry. v. McGrew*, 104 Mo. 282, 15 S.W. 931, 935 (1891) (holding that "the interest acquired by a railroad company to its right of way ... [is a] right to an absolute and exclusive possession"); *St. Louis I.M. & S. Ry. Co. v. Cape Girardeau Bell Tel. Co.*, 134 Mo.App. 406, 114 S.W. 586, 589 (1908) (holding that a railroad easement is perpetual and "excludes the owner of the fee and all other persons"). This is consistent with the general law regarding the nature of a railroad's interest in a railroad right-of-way. *See, e.g., Western Union Tel. Co. v. Penn. R.R. Co.*, 195 U.S. 540, 570, 25 S.Ct. 133, 49 L.Ed. 312 (1904) ("A railroad right of way is a very substantial thing. It is more than a mere right of passage. It is more than an easement.").

Plaintiffs, however, argue that this exclusivity of use does not extend to the corridor easement when used for trail purposes. They argue that the trail should be treated the same as a general easement under Missouri law, which provides that a fee owner can use the surface in any way not inconsistent with the purpose of the easement. *See Earth City Crescent Assoc. v. LAGF Assoc.-Mo.*, 60 S.W.3d 44 (Mo.Ct.App.2001) (holding that the owner of land burdened by an easement for access to a landlocked parcel had the right to use the land as long as it did not "substantially interfere" with the easement holder's reasonable use); *see also Stotzenber-*

---

**15.** The ICC schedule compiled in 1920 which purportedly characterizes the various means by which the railroad acquired its interests in the right-of-way notes that for much of the right-of-way the railroad had no document by which it acquired its interest. For 36 of 57 relevant parcels inventoried, the ICC schedule notes that no written title could be located. We do not necessarily believe that the ICC schedule is the last

word as to whether a legitimate conveyance once existed or not. The parties are free to contest whether a proper conveyance once existed on a claim-by-claim basis.

**16.** We note that the presence of utility licenses along the railroad may be included in a showing of proof of use.

*ger v. Perkins,* 332 Mo. 391, 58 S.W.2d 983 (1933) (stating that an underlying fee owner was allowed any use of his property as long is it did not interfere with reasonable use of the easement); *Miss. River Transmission Corp. v. Wachter Const.,* 731 S.W.2d 445 (Mo.Ct.App.1987).

We disagree. What was imposed on plaintiffs' land was a new easement which purported to preserve railroad use. The Trails Act was enacted in order to "to preserve established railroad rights-of-way for future reactivation of rail service, [and] to protect rail transportation corridors." 16 U.S.C. § 1247(d). Although we have previously found that interim trail use, or railbanking, was not a legitimate railroad purpose, *Glosemeyer v. United States,* 45 Fed.Cl. 771 (2000), the stated intent of the government in creating the Trails Act was to preserve railroad rights-of-way as they existed. *See* 16 U.S.C. § 1247(d) (stating that "if . . . interim trail use is subject to restoration and reconstruction for railroad purposes, such interim use shall not be treated . . . as an abandonment of the use of such rights-of-way for railroad purposes."). Although interim trail use of the railroad corridor was authorized by the Trails Act through the NITU issued here, the use of the easement for trail purposes is subject to the future restoration of rail services. *See id.;* 49 C.F.R. § 1152.29(a)(3). The clear implication is that defendant wished to maintain the status quo, securing for Trailnet whatever rights MoPac previously held in the easement.

 The new easement, in short, was intended to be capable of functioning at a later date as a railroad easement. The Trails Act and its implementing regulations require trail sponsors to assume "full responsibility" for managing the right-of-way and for any legal liability arising out of the right-of-way. 49 C.F.R. § 1152.29(a)(2). As part

of this responsibility, a trail sponsor must also make assurances that the right-of-way is kept available for "future reconstruction and reactivation . . . for rail service." *Id.* § 1152.29(a)(3). In order to meet these requirements, we believe the Trails Act and its implementing regulations require that a trail sponsor must have the same control over the entire right-of-way corridor that would be held by a railroad in order that the trail sponsor can ensure that any and all uses made of the right-of-way are consistent with the restoration of rail service. As discussed above, under Missouri law, such control is exclusive. We therefore conclude that the Trails Act imposed a new easement across plaintiffs' properties which retained essentially the same characteristics as the original easement, both in its location and exclusivity.[17]

### III. The License Agreement

 Plaintiffs contend that the new interest taken by the government through the operation of the Trails Act includes the licenses conveyed by MoPac to Trailnet as part of the Trail Use Agreement.[18] Because UE's licenses, as well as the other utility licenses, were derived solely from MoPac's railroad easement, plaintiffs argue that UE had no right under Missouri law to continue to maintain and use its power lines on plaintiffs' property after MoPac's easement was extinguished on December 30, 1992, the date on which Trailnet consummated the trail Use Agreement with MoPac. Because MoPac ostensibly conveyed its longitudinal licenses with UE, as well as other utility licenses, to Trailnet under the authority of the Trails Act, plaintiffs assert defendant is required to pay just compensation to plaintiffs for the licenses conveyed because those new licenses

---

17. We note in passing that, as far as is consistent with state law, a landowner should be free to *negotiate with the trail sponsor over specific uses* of the property. The record in this case reveals that MoPac, in fact, granted cultivation and drainage licenses to abutting landowners during its use and occupancy of the corridor.

18. On October 31, 2003 plaintiffs filed supplemental information concerning the parties' pend-

ing cross-motions. The submission consists of information plaintiffs believe supports their position concerning the scope of the easement taken by defendant. Because we find that Trailnet's easement, by operation of the Trails Act, provided Trailnet with the authority to grant certain sub-easements or licenses, the information offered by plaintiffs is not necessary to resolve the dispute.

would not have arisen but for operation of the Trails Act.

Plaintiffs' claim, in this respect, raises novel and complex issues involving the overlap of state and federal law. An initial question is whether MoPac, or its predecessor-in-interest, Pacific, ever had the authority to grant UE the licenses at issue. If not, UE arguably may have acquired a proscriptive easement in the interim. If, on the other hand, MoPac was authorized to grant such licenses under Missouri law, plaintiffs may be correct in their contention that these licenses would have terminated at the time of MoPac's abandonment, in which case UE would have had to renegotiate a licensing agreement with the fee owners, or initiate condemnation proceedings, depending upon Missouri law. If the operation of the Trails Act indeed insured that Trailnet would have the same authority as MoPac to grant licenses, assuming the railroad company had such authority, the value of the easement held by Trailnet would certainly be greater than if it lacked such authority. This apparently is plaintiffs' argument—that MoPac had the authority to grant licenses to UE, but that authority terminated with MoPac's abandonment of the right-of-way.

We agree with plaintiffs. It was the intent of the Trails Act to ensure that Trailnet had the same rights in its easement that MoPac held, and that consequently, in determining the value of the easement imposed on plaintiffs by the government, we must include the value of Trailnet's authority to grant licenses to UE and other utilities, at least insofar as they are embraced by railroad use. It appears from the record that all parties involved in the events leading up to MoPac's abandonment of the right-of-way—MoPac, Trailnet, and the United States—assumed that Trailnet would essentially have the same authority over the new easement that MoPac previously held under the old easement.[19] In fact, that authority played a crucial role in consummation of the Trail Use Agreement.

It appears from the record that the payments stemming from the utility licenses were an integral part of the negotiations between Trailnet and MoPac for transfer of the railroad easement. A draft contract required Trailnet to make a $40,000.00 down payment and execute a promissory note for the remaining purchase price of $410,000.00. Later, in a letter dated November 24, 1992, Trailnet informed MoPac that its Board of Directors authorized a maximum payment of $150,000.00 over a two-year period for the right-of-way. The letter further explained that this maximum payment was based on Trailnet reaching a licensing agreement with UE. On December 7, 1992, Richard Gilpin, attorney for Trailnet, sent a letter to Ms. Christine Smith, attorney for MoPac. Attached was a first draft of an agreement between the parties, which provided for MoPac and Trailnet to divide equally the proceeds of any sale of an easement granted to UE.

The agreement specifically provided that the property conveyed was subject to leases and licenses, which would be assumed by Trailnet:

> The Property is subject to the leases and licenses ("Leases and Licenses") listed on Exhibit D attached hereto and hereby made a part hereof. At closing, the Leases and Licenses, to the extent the Property is covered thereby, shall be assigned to an assumed by [Trailnet] by Assignment and Assumption of Leases and License .... Rentals under the Leases and Licenses shall be pro-rated as of the date of closing, and [MoPac] shall retain all rights to all rental due for the period prior to closing, including, without limitation, the right to collect such rental directly from the tenant or licensee and to receive from [Trailnet] any such past-due rentals paid to [Trailnet].

On the same day that MoPac executed a quitclaim deed conveying all of its interests

---

**19.** To the extent that plaintiffs' argue that the "transfer" of the utility licenses was part of the taking, we decline to make that a basis of our holding. In our view, once MoPac abandoned the easement, the easement terminated and a new easement was created in favor of Trailnet by operation of the Trails Act. MoPac therefore had no legal basis for transferring any other interest appurtenant to the old easement. However, we look to the negotiations involved as evidencing the intent of the parties as to scope of the new easement created in favor of Trailnet.

to Trailnet, MoPac and Trailnet entered into a Blanket Assignment of various agreements previously entered into between MoPac and licensees, including UE. On January 27, 1994, MoPac and Trailnet entered into a Partial Assignment Rider Agreement, under which MoPac assigned a Wire Line Crossing Agreement with UE to Trailnet. The Agreement provided that it "shall be considered as taking effect as of the 30th day of December, 1992." In letters to UE dated February 24, 1994, March 7, 1994, and April 27, 1994, Trailnet sought payment by UE for licenses assigned by MoPac to Trailnet in the Trail Use Agreement. In a December 2, 1994 letter to St. Louis County, Trailnet stated that it owed $300,00.00 to MoPac payable by the end of 1997, "[t]o be funded by transaction with [UE]: we are to sell UE an easement for existing utility licenses on the corridor."

The evidence establishes that it was the intent of MoPac and Trailnet that Trailnet would have the same relationship with the licensees that MoPac previously held. This is entirely consistent with the stated purpose of the Trails Act to preserve the railroad corridor in essentially its original character in order that railroad use could one day be reinstated. *See* 16 U.S.C. § 1247(d) (stating that the purpose of the Trails Act is to further the national policy of "perserv[ing] established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use ..." and that interim trail use subject to restoration of rail use "shall not be treated ... as an abandonment ...."). Because MoPac's right-of-way for railroad purposes was exclusive under Missouri law, Trailnet's was as well. The rights MoPac originally held in the right-of-way easement are therefore critical in determining the issue presented here. In order to determine the extent of the rights currently held by Trailnet, we must sort out the rights originally held by MoPac under state law.

In Missouri, as in most states, the regulation of public utility companies falls within the jurisdiction of the state's Public Service Commission. Mo. Stat. Ann. § 386.250 (Ver-

non 2002). Such companies are authorized by statute to condemn land or other property in order to construct and maintain electric lines, Mo. Stat. Ann. ch. 523, telephone and telegraph lines, Mo. Stat. Ann. ch. 392, as well as gas, electric, water, and sewer pipes and lines, Mo. Stat. Ann. ch. 393. The applicable statutory provisions contemplate that the utility will attempt to reach an agreement with the underlying fee owner, but formal condemnation proceedings may be initiated if no agreement can be reached. This authority also allows utilities to locate power lines and other utilities within railroad rights-of-way. *See Am. Tel. & Tel. Co. v. St. Louis, Iron Mt. & So. Ry. Co.,* 202 Mo. 656, 101 S.W. 576, 582 (1907). When a utility locates within a railroad's right-of-way, whether by license agreement or by condemnation, and regardless of whether the railroad's interest is in fee simple or an easement, compensation must be paid to the railroad company. *Id.,* 101 S.W. at 585–86 ("That a railroad company ... may build and maintain *or may rent a permit* to build and maintain a telegraph line on each side of its right of way, ought not to be doubted—such use being an adjunct of railroading." (emphasis added)).

Railroad easements are unique. *See, e.g., Western Union Tel. Co. v. Penn. R.R. Co.,* 195 U.S. 540, 570, 25 S.Ct. 133, 49 L.Ed. 312 (1904) ("A railroad right of way is a very substantial thing. It is more than a mere right of passage. It is more than an easement."). As explained in *St. Louis Iron Mt. & So. Ry. Co. v. Cape Girardeau Bell Telephone Co.,* 134 Mo.App. 406, 114 S.W. 586, 587 (1908), the court explicitly stated that "[i]n Missouri, the estate of a railroad company in lands acquired for railroad purposes, right of way, etc., amounts to an easement only. The fee to the lands thus occupied continues to reside in the adjacent landowners." However, the court held that

The telegraph and telephone are conveniences so essential, if not indispensable to the purposes of a railroad, that a railroad company may establish and construct one or both along the line of its right of way, to be used in the prosecution of its business in operating the road, and such use, essential as it is, is not an additional servitude

upon the fee. In other words, such conveniences essential to the prosecution of the calling for which the railroad right of way was acquired, are within the contemplation of the original grant for railroad purposes and therefore regarded as not an additional servitude upon the fee of the adjacent landowner.

*Id.* The court recognized the railroad company's power to

> construct and maintain such telephone or telegraph line on the right of way for its own purpose, or it may take a partner into the enterprise, or contract with another to erect and maintain the line and furnish the required telephonic or telegraphic service to the end of transmitting intelligence with respect to the operation of its trains, carriage of traffic, passengers and other needs of its calling. In such circumstances, the telephone is not an additional servitude upon the fee of the adjacent owner, but on the contrary, it is viewed as a legitimate development of the easement acquired for railroad purposes.

*Id.* The railroad is not, however, permitted to "use, sell, or incumber the easement for other than railroad purposes." *Id.,* 114 S.W. at 589; *see also State ex rel. State Highway Comm. v. Union Elec. Co.,* 347 Mo. 690, 148 S.W.2d 503, 506 (1941) ("Since the railroad company had only an easement interest in the land it had no right to grant an additional easement burden for the transmission line *beyond the period of use by the railroad for right of way purposes.*" (emphasis added)).

 It thus appears that under Missouri law a railroad company holding an easement for railroad purposes across a piece of property held in fee by another has the right to grant a license to a utility company so long as the utility has some connection to a railroad purpose. We believe that this right, once held by MoPac, is now held by Trailnet by operation of the Trails Act, consistent with the intent to preserve the Carondelet Branch for future railroad use. The

value of the new easement imposed on plaintiffs' property by operation of the Trails Act must therefore take this authority into consideration. To the extent that the utility licenses are for a legitimate railroad purpose, Trailnet has the authority to contract with such licensees and receive payment in exchange. To the extent that any license does not have a legitimate railroad purpose under Missouri law, MoPac never had any authority to grant such licenses and, consequently, neither does Trailnet. Such licenses therefore may not be considered when computing the value of the property taken from plaintiffs by operation of the Trails Act. As against such users, plaintiffs would have to bring any claims in state court.[20]

## CONCLUSION

To the extent and for the reasons explained above we grant both parties' motions for summary judgment in part. The parties are directed to consult and propose further pretrial proceedings in a joint status report to be filed by defendant on or before December 22, 2003.

---

20. We understand that our opinion does not establish which licenses may or may not have a connection to railroad purposes. The parties have not addressed that issue and neither do we. To the extent that any claims are left unresolved,

that issue will necessarily be addressed at a later stage of the litigation.

