Dorothy M. MOORE, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 93–134L.

United States Court of Federal Claims.

June 18, 2004.

William J. Travis and William C. Dunning, Greensfelder, Hemker & Gale, P.C., St. Louis, Missouri, for plaintiffs.

William J. Shapiro, U.S. Department of Justice, General Litigation Section, Environment & Natural Resources Division, for defendant.

## OPINION

BRUGGINK, Judge.

This is a class action in which the plaintiff class members seek compensation for the imposition of an easement for recreational trail use on their land. The court previously ruled that the government did in fact take such an easement for public use without compensation. *Glosemeyer v. United States,* 45 Fed.Cl. 771 (2000) (including the consolidated case of *Moore v. United States,* No. 93–134L). Following a valuation trial as to 13 representative parcels, we determined just compensation for those parcels. *Moore v. United States,* 54 Fed.Cl. 747 (2002). Thereafter, the parties negotiated the amount of compensation due for the vast majority of the remaining claims. On August 15, 2003, the parties filed a partial stipulation on the amount of just compensation and interest as to certain class members and a joint motion for judgment pursuant to RCFC 54(b). The parties agreed on the amount of compensation due for 280 of the remaining 298 claims.[1] We subsequently dismissed seven of the remaining eleven claims on defendant's motion. *Moore v. United States,* 58 Fed.Cl. 134 (2003). The parties were able to resolve the amount of just compensation as to eight of the remaining eleven unaddressed claims. On February 17 and 18, 2004 we held trial in St. Louis, Missouri as to the valuation of the final three claims: 6, 69, and 107.

## DISCUSSION

The date of taking is June 25, 1987, when the MKT Railroad transferred its right-of-way to the State of Missouri Department of Natural Resources. *See Glosemeyer,* 45 Fed. Cl. at 775–76. Accordingly, damages are determined as of that date.

■ During trial, the parties presented their calculations of the value of the property taken through competing expert witnesses. Both experts used a "before and after" methodology to determine compensation. This requires "a determination of the fair market value of the entire affected parcel as if the easement did not exist and then another determination in light of the taking." *Moore,* 54 Fed.Cl. at 749. The figure resulting from a proper application of a before and after analysis includes the value of the part actually taken, together with any severance damages affecting the value of the remaining parcel. *Id.; Washington Metro. Area Transit Auth. v. United States,* 54 Fed.Cl. 20, 27 (2002).

Both experts first sought to produce a value estimate based on the fair market value of the parcels "before" the taking—*i.e.,* the value of a particular parcel as if the new trail easement had not been imposed. The experts then produced a second "after" value approximating the fair market value of the parcels after the imposition of the easement. For purposes of their appraisal reports, both parties treated the new easement as if it took a fee interest in the property. For both experts, the difference in the before and after values produced a damages figure. The parties agree that the after value figure should reflect the value of the actual area taken by the easement as well as any severance damages, if appropriate under the circumstances. Plaintiffs claim severance damages in all three instances; defendant disputes severance damages.

---

1. That agreement was subsequently withdrawn and is now subject to renegotiation.

## I. Claim No. 6

Claim No. 6 is brought by Susan J. (Stock) Bandy and John H. Stock, her brother. The Stock property is located in St. Charles County, Missouri. The Stocks inherited the property upon the death of their mother, Alice H. Stock, in 1998. Their claim consists of two long narrow tracts. Parcel B extends for approximately 1475 feet along the railroad right-of-way. Adjacent Parcel D extends another 275 feet along the right-of-way. Both tracts are approximately 120 feet wide, not including the easement area. The parties agree that the claimants own one-half of the 60 foot easement formerly occupied by the railroad, a thirty foot wide strip. The area covered by the Stock easement is thus 1750 feet long and 30 feet wide.[2]

The entire Stock property is located in a flood plain and roughly parallels the old railroad bed and the adjacent highway, South River Road. It is zoned by the county as "flood plain" land. The tract was separated from South River Road by the railroad right-of-way. Even after abandonment of the railroad track, however, the Stocks do not directly abut South River Road, because title to the other half of the right-of-way remains with other owners. Before the taking, four small rental homes were located on the property. In the past, plaintiffs accessed the property by driving over the former railroad right-of-way and along the railbed to get to each home. The four residences on the parcel were each rented for $100 per month. The houses were destroyed by flood in 1993, after the taking.

Mr. Kevin Nunnink, the government's expert, utilized a cost approach, a sales comparison approach, and an income capitalization approach in appraising the fair market value of Claim No. 6. In his report, Nunnink described the three different valuation techniques as follows:

> The cost approach assumes that the informed purchaser would pay no more than the cost of producing a substitute property with the same utility. This approach is particularly applicable when the improvements being appraised are relatively new

and represent the highest and best use of the land, or when the property has unique or specialized improvements for which there is little or no sales data from comparable properties. The land value for the subject property is developed as part of the cost approach.

> The sales comparison approach assumes than an informed purchaser would pay no more for a property than the cost of acquiring another existing property with the same utility. This approach is especially appropriate when an active market provides sufficient reliable data that can be verified from authoritative sources. The sales comparison approach is less reliable in an inactive market, or when estimating the value of properties for which no real comparable sales data is available. It is also questionable when sales data cannot be verified with principals to the transaction.

> The income capitalization approach reflects the market's perception of a relationship between a property's potential income and its market value, a relationship expressed as a capitalization rate. This approach converts the anticipated benefits (dollar income or amenities) to be derived from the ownership of property into a value indication through capitalization. This approach is widely applied when appraising income-producing properties.

Def's Trial Ex. 2, at 30.

Both experts acknowledged that the sales comparison approach is the preferred methodology for improved properties. Nunnink therefore attempted to locate comparable sales in the St. Charles area of large tracts improved with residences. From this he generated a "before" value, as explained below. Because the parcel actually taken, however, is vacant land, for his "after" value, he had to determine a specific per acre value using a comparable sales approach for vacant land, as explained below. This comparable sales approach to the vacant land he then also used as the starting point for the income capitalization and replacement cost ap-

---

2. The parties also agree that the claimants are entitled to 100% of the compensation due for Parcel D but only 2/3 of the compensation due for Parcel B.

proaches which both add an estimated value of the improvements to the vacant land value. All three alternative approaches thus employ an estimated vacant land value from a comparison sales analysis of vacant parcels.

In order to derive an opinion of the vacant land value of the Stock property, Nunnink assembled sales data for comparable tracts. Because the Stock property was located in a flood plain, Nunnink expanded the scope of comparables to include nearby flood plain industrial tracts in St. Charles County. Nunnink selected three sales as comparables. The first tract is a residential plot located on South River Road, not far from the Stock property. A ten acre lot, Comparable 1, sold on October 1, 1985, for $40,000, or $0.09 per square foot. The second tract is a four acre industrial tract located in a flood plain in northern St. Charles County. On May 23, 1986, Comparable 2 sold for $24,000, or $0.14 per square foot. The third comparable is a St. Charles industrial tract not located in a flood plain. On October 23, 1984, this 2.69 acre parcel sold for $98,000, or $0.84 per square foot.

Nunnink made certain adjustments to this comparable sales data in order to arrive at the value of the Stock property if vacant. He adjusted Comparable 3 downward $0.50 per square foot for its superior location near the Interstate 70 industrial area. Nunnink further adjusted Comparable 3 down $0.20 per square foot because it is not in a flood plain. He adjusted both Comparable 2 and 3 down by 50% because of their superior industrial classification. Comparable 1 was adjusted down by 10% because it was zoned by the city as residential, contrasted with the Stock property's flood plain zoning. Based on these adjustments, the three comparables provide a range of value indications from $0.07 to $0.08 per square foot. Giving greatest weight to Comparable 1, which most resembled the Stock property, Nunnink arrived at a value of $0.07 per square foot. This is equivalent to $3,050 per acre. The stock property, 261,152 square feet total, was

therefore estimated to be worth $18,281, if vacant.

As Nunnink explained, for the cost approach, after establishing the value of the property as vacant, the appraiser then must go through the following steps to determine the value of the property as improved: (1) estimate the cost of replacing or reproducing the existing improvements under retrospective market conditions; (2) estimate depreciation; (3) add the land value and depreciated value of the improvements to arrive at an indication of market value for the property; and (4) add depreciation, if any, of personal property included in the valuation. Nunnink estimated the replacement cost for the improvements on the Stock property, at current prices, to be $121,742. This figure was based on his estimate of direct and indirect costs. Nunnink estimated the cost of incurable physical deterioration, based on a 30–year effective age and a 50–year economic life, at $73,045, for a total depreciated cost of $48,697. Adding the land value of $18,281, Nunnink arrived at a final value indication of the Stock property, based on the cost approach, of $67,000.

Nunnink then utilized a sales comparison approach of improved properties to arrive at an alternate value indication.[3] In this approach, Nunnink surveyed sales activity for single family properties in the St. Charles area. He selected three improved sales as most comparable and as the best indicators of value for the Stock property. All three residences were located in St. Charles County. The first sale, located north of the Stock property, was built in 1940 and sold for $24,000 on September 16, 1987. The second sale, located nearby, was also built in 1940. It sold for $31,000 on March 5, 1987. The third sale, also a home built in 1940, is located near the first sale. It sold for $18,000 on October 30, 1986.

Nunnink made the following adjustments to the comparable sales figures. The third sale was adjusted up 6% because the transaction included a broker/buyer and the 6%

---

3. This involved the four following steps: (1) research timely sales of comparable improved properties; (2) select the most comparable sales and present the pertinent data on these sales; (3) adjust the sales for differences in the various elements of comparison; and (4) summarize the analysis and conclude a value indication based upon the adjusted sale prices of the comparables.

commission was not paid by the seller as is customary. The first and second sales were adjusted down 10% because they were both considerably larger than the average size of the Stock's four residences. After these adjustments, Nunnink estimated a price per unit of $24,000 for the four residences located on the Stock property, making a total value of $96,000.

Finally, Nunnink employed the income capitalization approach. Based on lease income of $100 per month, per house, and information from the St. Charles County Assessor's Office indicating a multiplier of 10 or 11 times gross rent, Nunnink calculated a $13,200 value per residence. Multiplied by four and then added to the value of the excess land (based on $0.07 per square foot vacant land value), this produced a value indication of $68,841, rounded to $69,000, for the income capitalization approach.

Nunnink thus had three alternate valuation figures: $67,000, $96,000, and $69,000. He ultimately chose the sales comparison approach because, in an active market with timely sales, it is the most accurate. Thus $96,000 became his final value conclusion for the "before" value of the Stock property.

To produce an "after" figure for the Stock property, Nunnink subtracted from the before value the vacant land value of the actual area of the easement taken. In his opinion, after the imposition of the easement, the Stock property had the same value as before the acquisition, with the exception of the loss of the use of the 30 foot strip underlying the Stock's half of the Katy Trail. Using the description of the property provided by the government, Nunnink calculated that the actual area burdened by the easement was 52,500 square feet (1,750 feet of frontage × 30 feet). At a price of $0.07 per square foot (as estimated above), Nunnink arrived at a value of $3,675, rounded to $3,700.

Nunnink concluded that no separate severance damages were appropriate for the portion not burdened by the new easement. In his opinion, no reasonable buyer of the Stock property would pay less for the Stock parcel

as a whole because of the presence of the Katy Trail. Nunnink conducted a case study of recent property sales,[4] pairing a property not adjacent to the Katy Trail with one adjacent to the Trail. This paired sales analysis convinced Nunnink that there is no discernable diminution of value or severance damage resulting from imposition of the easement. In addition, however, Nunnink did not believe severance damages resulting from loss of access were appropriate because a letter provided by the MDNR indicated its intention to allow crossing of the trail for access to the property for the duration of the interim trail use easement.

Mr. Edward Dinan, plaintiffs' expert witness, agreed with Nunnink on the size of the easement imposed on the Stock property, 52,500 square feet. He came to a different conclusion, however, concerning the value of the land and the availability of severance damages.

Finding that the cost and income capitalization approaches were not applicable to the Stock property, Dinan stated that he relied on a sales comparison approach of improved properties. He first produced a land value for the vacant portion of the Stock property based on comparable vacant land sales. He then added to that figure an improved land value based on the rental income generated by the four residences.

Dinan located five comparable sales of vacant flood plain property in St. Charles County, ranging from $4,900 to $29,412 per acre. The sales took place between 1986 and 1991. He adjusted the 1989 and 1991 sales down. He made no adjustment to the 1986 and 1987 sales. Dinan concluded that all five of the comparable sales had inferior locations compared to the Stock property relative to major thoroughfare access and proximity to surrounding development, and therefore, all of the sales were adjusted up. Sales one, two, and three were further adjusted down because of their size. Based on these comparable sales, as adjusted, Dinan produced a unit value of $11,000 per acre for the vacant

---

4. This is the same case study discussed in the previous valuation trial. *See Moore,* 54 Fed.Cl. at 752–54.

section of the Stock property pre-taking. This compares to the $3,050 per acre figure Nunnink derived.

Dinan produced a separate figure for the area occupied by the four residences. Based on discussions with rental market specialists and other real estate professionals, Dinan concluded that a Gross Rental Monthly Multiplier ("GRMM") of 100 was a reasonable means of determining value. At a rental rate of $100 per month, Dinan concluded that the four residences were worth a total of $40,000. Dinan subtracted the 0.64 acres estimated for the land occupied by the homes, and multiplied the remaining acreage by $11,000, for a $58,960 value for the vacant portion. Adding the two totals thus produced a rounded before value of the Stock property of $99,000. This compares to Nunnink's figure of $96,000.

Dinan employed the same methodology for his calculation of the after value of the Stock property. The only differences were the loss of 52,500 square feet to the new easement at a cost of $11,000 per acre and a 5% reduction for the assumed severance damages attributable to the questionable access rights the property owners now have to South River Road. The total rounded after value is $81,000, producing a difference between the before and after values for Claim No. 6 of $18,000.

■ As in the prior valuation trial, we find Nunnink's appraisal methodology "more comprehensive, rigorous and transparent" than that presented by plaintiffs' expert. *Moore,* 54 Fed.Cl. at 751. Dinan did not explain any of the adjustments made to the value of the comparable sales, nor could he identify the precise percentage of the adjustments made. In contrast, Nunnink's reports explain and quantify all adjustments. Furthermore, it appears that Dinan's land valuation calculations were not based on standard valuation methodology accepted in the appraisal industry. Rule 1–4(e) of the Uniform Standards of Professional Appraisal Practice

states, "An appraiser must analyze the effect on value, if any, of the assemblage of the various estates or component parts of a property and refrain from valuing the whole solely by adding together the individual values of the various estates or component parts." Dinan's valuation methodology is inconsistent with this standard, in that he calculated separate values for the residences and the undeveloped section of the parcel. He provided no explanation for deviating from the standard. Nunnink, in contrast, produced a single value for the entire parcel.[5]

■ We thus accept Nunnink's raw figures concerning the value of Claim No. 6 in the before and after calculation. Although the two experts "before" values are very close, the relevant difference is in the value per acre to assign to the land underlying the easement: $3,050 per acre in Nunnink's opinion, and $11,000 per acre according to Dinan. Before accepting a final compensation figure, however, we must address whether severance damages are appropriate. Defendant argues that no adjustment should be made because MDNR has expressed no intention of interfering with plaintiffs' access to the property. Defendant offers letters from Deborah Schnack, an MDNR employee, to defendant's counsel in which Ms. Schnack states that the MDNR will continue to allow access to plaintiffs' property over the Katy Trail.

As we held in *Illig,* under Missouri law, the MDNR's right to the Katy Trail is exclusive. *Illig v. United States,* 58 Fed.Cl. 619, 631 (2003). There does not appear to be any reason why MDNR could not simply ignore the promise made in this letter and restrict plaintiffs' access in the future. The precise legal effect of the letter, however, is not the real issue. In assessing compensation, we are concerned with the diminution of value affected by the imposition of the Katy Trail in terms of what a willing buyer would pay for the property. Specifically, would a reasonable buyer be concerned about the poten-

5. We also found Nunnink's approach more plausible in light of the zoning restrictions on the Stock property. From 1973 to 1999, the parcel at issue in Claim No. 6 had a minimum lot size of ten acres. The original four residences on the property were permitted by exception, but if the owners had wanted to redevelop the property after the flood of 1993, they could only build one home. This restriction on the use of the parcel naturally would effect its market value.

tial loss of access across the Trail? Would he or she give any weight to the apparently revocable promise made by MDNR? Nunnink believes a reasonable buyer would disregard the presence of the Katy Trail and would take MDNR's promise seriously. As stated above, he has offered a case study of comparable sales to support his conclusion. While we have reservations about Nunnink's conclusion, plaintiffs have offered no data contradicting it. Instead, Dinan has applied an arbitrary 5% reduction to the value of the parcel.

Furthermore, under Missouri law, we do not believe that MDNR could ever entirely cut off access to the Stock property. Dinan himself testified that "you can't landlock a parcel," Tr. at 362, referencing section 228.342 of the Missouri Code. That section states, "A private road may be established or widened in favor of any owner or owners of real property for which there is no access, or insufficiently wide access, from such property to a public road if the private road sought to be established or widened is a way of strict necessity...." Mo. Rev. Stat. § 228.342 (2000). Consequently, even if the MDNR chose not to respect the promise expressed in the letter discussed above, plaintiffs' access would appear to be at least minimally insured.[6] We therefore conclude that severance damages are not appropriate and that $3,700 is the total compensation due for the taking of the Stock property through implementation of the Rails–to–Trails Act.

## II. Claim No. 107

■ Clam No. 107 is brought by Darline S. Meyer. The parcel at issue is located in Warren County, Missouri. The Meyer property is improved, with a residence on one edge of the property and a quarry taking up much of the rest. It lies adjacent to the Missouri River and straddles both sides of the trail. The parties agree that the trails act easement takes up 5.89 acres. Quarried rock is regularly hauled to the river for loading onto barges. In order to access the loading area, trucks must leave the Meyer property and cross both Bernheimer Road and the Katy Trail. In 1967, plaintiffs' predecessor-in-interest, Vester Meyer, entered into a crossing agreement with the MKT Railroad, giving him the right to cross the railroad easement.

Nunnink began his analysis by computing a "before" value of the land if vacant based on three comparable land sales in Warren County.[7] The first sale took place on December 1, 1987, and involved a parcel that sold for $849.99 an acre. The second parcel, closest to the Meyer property of the three comparables, sold on December 31, 1986 for $2,049 per acre. The third parcel sold on June 1, 1986 for $1,499 per acre. Nunnink made adjustments based on physical characteristics. Comparable 3 was reported by the buyer to be poorly drained cropland. Pairing Comparable 3 with Comparable 2, an adequately drained parcel, Nunnink determined that an upward adjustment of $600 per acre was required for Comparable 3. Comparables 2 and 3 are all cropland, whereas Comparable 1 is mostly upland with some grazing area. Pairing Comparables 2 and 3 to Comparable 1, most similar to the Meyer property, Nunnink determined that a downward adjustment of $1,000 was needed for the per acre value of Comparables 2 and 3.

Nunnink then determined a contributory value for the quarry.[8] According to the

6. While such theoretical ambiguity might have a market impact, it was not shown here. We also note that it remains unclear who owns the other half of the land burdened by the trail easement lying between the Stock's property and the road.

7. Nunnink originally stated in his report that the any extraction taking place on the property was only "conditional," on the understanding that the property was zoned for Agricultural and Forest Management use. At trial Nunnink admitted he was mistaken. The property is actually zoned for commercial or industrial use ("CID"), allowing unconditional mineral extraction. Nunnink

asserts that his mistake as to the zoning of the property, however, does not effect his value computation, because he assumed any such conditional permit would be granted.

8. We note that this piecemeal approach, estimating the quarry portion of the property separately, is inconsistent with the "unit rule" which we criticized Dinan for not following in his valuation of Claim No. 6. However, both experts found appraising the Meyer property rather difficult because of its unique characteristics and because of the lack of good comparables. While Nunnink's method is not as tidy here as it was in

county assessor's records, this area totaled about 25 acres and produced an annual gross rental income of $12,000. By comparison, the average annual rent paid for average to good pastureland in Warren County in 1987 brought in around $25 per acre. Nunnink then compared the income generated by the quarry rent to the income expected if the same area was rented as pasture land. The difference was then capitalized to determine the quarry's contribution to the value of the parcel. Nunnink settled on a 15% estimate. Using this figure, Nunnink adjusted each comparable up $630 per acre for the additional income provided by the quarry rent.

Based on these adjustments, the three comparable land sales provided a range of retrospective value indications of $1,480 to $1,729 per acre, with an average of $1,629. Nunnink settled on a $1,600 per acre figure for the Meyer parcel as of June 25, 1987. Multiplying by 120.27 acres produced a total vacant land value of $192,000.

For the cost approach, Nunnink followed the same steps outlined above in the discussion of Claim No. 6. He estimated the cost of replacing the existing improvements, depreciated that amount, and then added it to the vacant land value estimated above. He calculated a replacement cost of $90,652 for the improvements. He then subtracted $39,358 for long-term deterioration and $15,417 for short-term deterioration, producing a depreciated cost of $35,877. Adding this figure to the vacant land value of $192,000 produced a rounded total cost estimate of the value of the Meyer property prior to the taking of $230,000.

Nunnink also produced an alternate value through the improved sales comparison approach discussed above in Claim No. 6. He identified three sales of improved comparable properties around Warren County. The first sale was of a property located in Montgomery County for $1,141 per acre in August 1982. The second comparable, also in Montgomery County, sold for $937.50 per acre in January 1984. The third and final comparable is located in St. Charles County. It sold for $2,058 per acre in July 1986. Based on state and federal agricultural censuses, Nun-

nink noted that rural and farm properties in St. Charles county sold for more per site and per acre than properties in Warren or Montgomery Counties, and that Warren County farms sold for more than those in Montgomery county. Comparable No. 3 was therefore adjusted down 10% while Comparables 1 and 2 were adjusted up 10%. All of the comparables were adjusted down 10% for size. Comparables 1 and 2 were further adjusted up 25% because of the condition of the residences on the parcels. The comparables were then each adjusted down 10% for the topography of the land. Finally, each comparable was adjusted up $630 per acre to account for the quarry income on the subject parcel. Based on these adjustments, Nunnink produced a sales range from $1,674 per acre to $2,130 per acre. He finally settled on a rounded figure of $2,000 per acre for the Meyer property, producing a total "before" value estimate of $240,000.

Nunnink again found that the sales comparison approach of improved sales was the more reliable of the two methods, although they produced similar value estimates. He therefore settled on a final before value of the Meyer property of $240,000.

In order to determine the after value of the property Nunnink simply estimated the size of the area encumbered by the easement and multiplied it by $1,600 per acre. He estimated a frontage of 2,565 feet, and a trail width of 100 feet (the entire width of the easement), producing an area of 5.89 acres. Multiplying by $1,600 produced a value of $9,420, rounded to $9,400. Nunnink found no severance damages because of the crossing agreement between the Railroad and the property owner and because of his case study. He also relied on interrogatory answers indicating that the MDNR has historically respected the old railroad crossing agreement. Nunnink therefore concluded that the presence of the trail easement would have no effect on the value of the remaining parcel.

Dinan employed only the sales comparison approach in estimating the compensation due for Claim No. 107. Based on its CID zoning,

Claim No. 6, we still find it more convincing that        Dinan's appraisal.

he determined that the highest and best use of the property is for commercial and/or industrial use. Dinan employed two different sets of comparable sales, one for quarry sales and one for land sales. He divided the Meyer property into two different valuation categories, one for the quarry portion of the property and one for the farm/homestead portion of the property. He then used different comparable sales figures to value the two sections.

Dinan selected four sales to produce a quarry value figure. The first sale was of a quarry operation in Florissant, Missouri that sold for $4,020 an acre in July of 1991. The second sale also involved quarry property in Florissant, which sold for $14,213 an acre in December of 1993. The third quarry property is located in Stillwater, Minnesota. It sold for $11,538 per acre in April of 2000. The fourth comparable sale involved property in Perkiomenville, Pennsylvania that sold for $28,521 per acre in September of 1998. Dinan selected four farm properties for use in computing a comparable sales figure for the farm/homestead portion of the Meyer property. All four of these sales took place in Warren County and ranged between $1,815 per acre to $2,245 per acre. The first sale listed took place in 1994, The second and third sales took place in 1986, and the last sale took place in 1988.

Dinan made a number of unspecified adjustments to the quarry and farm sales. An upward time adjustment was made for all sales that took place prior to 1987. A downward adjustment was made to those sales that took place after 1988. Adjustments were made according to certain location factors, including proximity to major thoroughfares, zoning, etc. Dinan also made unspecified adjustments according to a variety of physical characteristics, such as terrain, flooding and size. Dinan made further adjustments to each of the quarry properties based on available quarry reserves, access, improvements, and land size. He also made adjustments to the agricultural comparables based on location, sale date, topography, and improvements.

Based on his research, Dinan believed the quarry portion of the Meyer property should be valued between $10,000 and $12,000 per acre. He ultimately settled on $11,000 per acre for the active portion. The remainder of the quarry site, according to Dinan, should then be valued around $2,000 per acre, the same value given the farm/homestead portion of the property. Dinan calculated that the 11 acres constituting the "active" portion of the quarry were worth $121,000. The remainder of the quarry, 63.58 acres, was valued at $127,160. He then took the total, $248,160, and divided it by the total quarry area of 74.58 acres, producing an integrated quarry valuation figure of $3,300 per acre. The 74.58 acre quarry section of the property, and the 5.22 acre portion of the corridor suitable for quarry use, were then multiplied by $3,300. The remaining farm/homestead portion of the property was multiplied by $2,000. This method ultimately produced a total before value of the Meyer property of about $325,000.

Dinan agreed with Nunnink on the size of the Meyer property burdened by the easement. He valued a portion of the easement at the $3,300 quarry value figure and the rest at the $2,000 farm/homestead price. However, he believed the after value of the remaining property must take into account severance damages. The value of the remaining property not burdened by the easement he reduced by 10% due to "traffic on the trail, additional risks associated with public access that is not monitored, the incompatibility of quarry operations with recreational uses, as well as the general nuisance and lack of control by the property owner." Def's Trial Ex. A, at 51. This valuation approach thus produced an after figure of about $275,000. The difference between the before and after values, $50,000, is asserted as compensation for Claim No. 107.

The question of the availability of severance damages aside, we again believe that Nunnink's testimony is more transparent and reliable than Dinan's. As discussed above in reference to Claim No. 6, Nunnink's adjustments are laid out in a chart providing the court with a clear rationale for quantification of the adjustments made. We also prefer Nunnink's overall approach which treats the Meyer property as basically agricultural land

with supplemental quarry rental income. While this method appears to be a blend of the improved sales comparison approach and the income capitalization approach, Nunnink's methodology is relatively easy to follow and appears to be fair. Dinan's $3,300 per quarry acre figure, in contrast, relies more heavily on the questionable separate treatment of part of the tract as an active quarry business, rather than as real estate. We therefore accept Nunnink's land value estimates for the Meyer property.

Dinan's report and his testimony at trial make clear that he found severance damages not so much on a loss of access across the trail but rather on "incompatibility of uses." Dinan's main concerns were liability and security. He expressed the fear that individuals using the trail might be attracted to the dock area situated by the river or into the quarry itself. Furthermore, the heavy machinery used in the quarry operation crosses the trail with high frequency on occasion. This might expose the property owners to liability for injury or increased insurance costs. Additionally, we do not believe Nunnink's case study is as relevant here. It involved only residential property, while Claim No. 107, in part, has an industrial use. During the site visit, the court observed the entrance to the quarry and the crossing used to access the barge loading area. It is the court's opinion that recreational trail users are a legitimate concern, and could, in fact, hamper the operation of the quarry or drive insurance costs up. However, we are presented with no market research and no insurance cost estimates to support the 10% figure. While we recognize the difficulty in quantifying the impact, the lack of any data compels us to limit plaintiffs' claim to the actual area taken by imposition of the easement. The court having accepted Nunnink's valuation estimates, total compensation due for Claim No. 107 is $9,400.

### III. Claim No. 69

■ Claim No. 69 is brought by Cletus and Verona Kampmann. Their property is located in St. Charles County at the intersection of Highway H and Music Ferry Road. The property is accessed either by a private driveway running east-west off Highway H or by a north-south private driveway off Music Ferry Road. On the date of taking, the Kampmann property was improved with several structures, including a residence and garage, two old grain elevators, and several newer grain elevators. The railroad formerly operated a side track along the east side of the Kampmann property to facilitate loadings from the silo complex. The parties agree that the Trails Act easement over the Kampmann property is 150 feet wide and 476 feet long—a total of 71,400 square feet.

In May 1988, the Kampmanns obtained a lease from the MDNR in order to access the easement area. In exchange for $12,000 the Kampmanns were provided a 19 year lease, renewable for four consecutive 20 year periods ($1.00 per 20 year period), providing the Kampmanns with use of a portion of the easement area. The lease contained an option to purchase, contingent upon approval by the Missouri legislature, giving the Kampmanns the right to purchase the land in fee for $1.00. The lease also contains an assignment clause restricting the use of the leased property by any assignee. "Such assignment shall prohibit any use of the leased premises which would interfere with the rail bank purpose of the adjacent M–K–T right-of-way or be incompatible with the use of the adjacent MKT right-of-way as a trail in the Missouri State Parks system." Pl's Trial Ex. C, at 80.

Although Nunnink utilized both the cost and the improved sales comparison approach in estimating the value of the Kampmann property, he primarily relied on the latter because he believed it to be more reliable when valuing rural or agricultural land. He followed the same methodology discussed above in Claim Nos. 6 and 107. He began by selecting three comparable land sales in order to produce a vacant land value for the Kampmann property. All three of the comparables are located in St. Charles County. Comparable 1, located closest to the Kampmann property, sold for $5,000 per acre in November of 1984. Comparable 2, located southwest of the Kampmann property, sold for $6,000 per acre in May of 1986. Comparable 3, located north of the Kampmann par-

cel and close to the Mississippi River, sold for $3,942 per acre in March of 1985. Comparable 2 was adjusted down 20% because of its proximity to St. Charles city limits. Comparable 1 was adjusted down 10% because of its size. Based on these adjustments, Nunnink produced a value range of $3,548 to $5,000 per acre. Relying primarily on Comparable No. 1, which is most similar to the Kampmann property, Nunnink selected $5,000 as the per acre value. At 3.6 acres, this produced a vacant land value of the Kampmann property of $18,000.

Under the cost approach, Nunnink estimated the value of the improvements located on the Kampmann property and added that figure to the base vacant land figure. Considering both direct and indirect costs, Nunnink estimated that the value of all the improvements on the property, as new, was $816,734. Taking depreciation into account reduced this figure to $204,355. Adding that figure to the vacant land value of $18,000 produced a total "before" value of the Kampmann property under the cost approach of $220,000.

For the sales comparison approach, Nunnink selected three sales involving improved property comparable to the Kampmann parcel. All three comparable properties are located in St. Charles County west of the Kampmanns. The first sale involved a parcel of land with a one-and-a-half story residence built in 1890, remodeled a few years before purchase, a well maintained barn, and eight additional outbuildings. It sold for $114,000 in January of 1990. The second comparable sale included a ranch-style home and detached garage built in 1960. This parcel sold for $69,900 in October of 1990. The third sale included another ranch-style home and detached garage built in 1953. It sold for $52,000. Sales 2 and 3 were adjusted up by 15% for size. Sale 1 was adjusted down 10% because it had a larger residence. Sales 2 and 3 were adjusted up 10% because the homes were smaller.

Because Nunnink was unable to find a comparable sale of a residence with grain elevators, he relied partially on the cost approach to formulate a property value. According to the depreciated figures discussed above, Nunnink estimated that the value of the agricultural structures was $111,855. Nunnink also looked at the rental income received by the Kampmanns in 2000 and 2001 for the rental of the agricultural structures located on the property. The Kampmanns received rental income of $15,948 in 2000 and $26,948 in 2001. Based on an overall capitalization rate of 15%, this produced a contributory value of $142,987, rounded to $140,000. Nunnink then adjusted Sales 2 and 3 up by $120,000 and sale 1 by $100,000 to account for these agricultural structures. These adjustments produced a value range between $185,000 and $207,375. Giving primary reliance to Sale 1, Nunnink settled on a value estimate under the sales comparison approach of $200,000, which he chose as his final "before" value.

As in the other two claims at issue here, Nunnink once again believed that no severance damages were appropriate in Claim No. 69. He therefore produced a damages figure simply by multiplying the physical area of the easement, 71,400 square feet, by the $5,000 per acre vacant land value estimated above. This produced a compensation figure of $10,463, rounded to $10,500.

Dinan employed only the sales comparison approach. He located six comparable grain elevator sales, three comparable agricultural land sales, and five comparable single-family homes sales from which he produced a before and after valuation figure for the Kampmann property. His before value estimate was $300,000. His after valuation figure was $250,000. Dinan also seeks return of the $12,000 paid for a lease providing the Kampmanns with access to the corridor, thus producing an estimated compensation of $62,000. Although they have valued the property differently, it appears that Dinan and Nunnink basically agree on the compensation due for the physical area occupied by the easement, $10,500. The additional $52,000 sought by plaintiffs is based on both the lease payment and Dinan's estimated cost to cure for the loss of access. Because the parties agree on the compensation due for the area of the easement, we will focus on the lease and severance damages.

The Kampmanns' son, Cletus Kampmann, Jr., testified at trial. He described how the silos are filled in the fall and unloaded in the spring. Because of the limited space in which to maneuver, and because of the continual flow of trucks, the trucks come into the silos through one entrance and out another. Whether loading or unloading, the trucks must use the north entrance to the property from Music Ferry Road. A significant portion of the north entrance as well as adjacent parking area is within the area of the current trail easement. If the trail manager were to exclude the Kampmanns, they would be required to create a new access from Music Ferry Road. Such an access would come within a few feet of the Kampmanns' residence and may, in fact, be impracticable due to the presence of a septic tank buried nearby in the yard. We are convinced, having visited the property, that the loss of access to the easement area would significantly hamper the Kampmanns' use of their property. This finding is further supported by the 1988 lease. We take the existence of this lease as further evidence that use of the easement area was essential to the operation of the silos.

Plaintiffs ask for both restitution of the $12,000 lease fee and reimbursement for possible "cost to cure" damages. Cletus Kampmann, Jr. testified that curing the loss of access to the silos would require either moving or razing the house. In Dinan's estimation, this would cost about $40,000. We do not believe cost to cure damages are appropriate, however, because no cure is necessary. The Kampmanns currently hold a long-term lease giving them access to the easement area. There is, therefore, no apparent need to tear down the Kampmanns' residence or move the silos to another location. On the other hand, there is no basis for requiring MDNR to return the $12,000 lease payment. As we held in *Illig*, Trails Act easements in Missouri are exclusive. 58 Fed.Cl. at 631. When the new Trails Act easement was imposed on the Kampmanns' property, the MDNR obtained the right to exclusive control.[9] This authorized the agency to grant leases such as the one sold to the Kampmanns.

We do, however, find that the Kampmanns have proven their entitlement to severance damages. The best evidence offered of the market value of the access required to fully enjoy the remaining portion of their property is the lease itself. The market value of the lost access is thus $12,000. Although the lease does not provide the Kampmanns with fee title, part of the original bargain expressed in the lease was an option to purchase the fee for $1.00. In essence, the difference in value between a 100 year lease and the fee itself was $1.00. We therefore find that the Kampmanns are entitled to $10,500 for the loss of the land physically occupied by the Trail and $12,000 for the loss of access, a total of $22,500 damages.

### CONCLUSION

Plaintiffs have established an entitlement to compensation in the amount of $2,642 for Claim No. 6,[10] $9,400 for Claim No. 107, and $22,500 for Claim No. 69, along with interest from the date of taking. Final judgment is deferred until further order of the court.

---

9. Limited, perhaps, only by easements of necessity, as discussed above.

10. $2,642 is the total compensation due after 1/3 of the compensation attributable to Parcel B is subtracted from the full $3,700 figure calculated for both parcels B and D in their entirety.